1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

2   --------------------------------x
                                        16-CV-4592(CBA)

3   UNIVERSAL PROCESSING
    SERVICES OF WISCONSIN,

4                                       United States Courthouse
            Plaintiff,                  Brooklyn, New York

5
            -against-                   November 21, 2016

6   SUNGAME CORPORATION, ET AL.,        2:00 p.m.

7
            Defendants.

8   --------------------------------x

9

10       TRANSCRIPT OF CIVIL CAUSE FOR PRE MOTION CONFERENCE
                BEFORE THE HONORABLE CAROL B. AMON

11                 UNITED STATES DISTRICT JUDGE

12  APPEARANCES

13  Attorney for Plaintiff:   THOMPSON & KNIGHT
                              900 Third Avenue

14                            New York, New York 10022
                              BY:  BRUCE J. ZABARAUSKAS, ESQ.

15

16  Attorney for Sungame:     ROSENFELD & KAPLAN LLP
                              535 Fifth Avenue
                              New York, New York 10017

17                            BY:  STEVEN M. KAPLAN, ESQ.

18  Attorney for Scorsetti:   ROBINSON MCDONALD & CANNA LLP
                              61 Broadway

19                            New York, New York 10006
                              BY:  BRETT GERALD CANNA, ESQ.

20

21  Court Reporter:           Georgette K. Betts, RPR, CSR, OCR
                              Phone:  (718)804-2777

22                            Fax:    (718)804-2795
                              Email:  Georgetteb25@gmail.com

23

    Proceedings recorded by mechanical stenography.  Transcript

24  produced by computer-aided transcription.

25

1          THE LAW CLERK:  Civil cause for

2   Pre Motion Conference, CV-16-04592.  Universal Processing

3   Services of Wisconsin v. Sungame.

4          Counsel, state your appearances for the record.

5          THE COURT:  Good afternoon.

6          MR. KAPLAN:  Good afternoon, Your Honor.

7          MR. ZABARAUSKAS:  Good afternoon.

8          MR. CANNA:  Good afternoon, Your Honor.

9          THE COURT:  Would the parties state their

10  appearances, please, first for the plaintiff.

11          MR. ZABARAUSKAS:  For the plaintiff, Bruce

12  Zabarauskas of Thompson & Knight.  With me I have in-house

13  legal counsel, chief legal officer Michael Schwartz and

14  Meredith Palermo, also in-house legal counsel for the

15  plaintiff.

16          THE COURT:  All right.  Good afternoon.

17          And for defendants.

18          MR. KAPLAN:  Your Honor, Steven Kaplan, Rosenfeld

19  Kaplan.  We represent defendants Sungame Corporation, Freevie

20  Corporation, Commander 3D, Neil Chandran, Chandran Holding

21  Media, Inc.

22          THE COURT:  Okay.

23          MR. CANNA:  Your Honor, I'm Brett Canna from

24  Robinson McDonald & Canna and we represent defendants, the

25  Loft by Angeles Furniture Collection doing business as The

1   Loft, LLC, Scorsetti Design, LLC and Maria Scorsetti.

2           THE COURT:  All right.  Good afternoon.

3           Now this case, as I understand it, originated in

4   Nevada and was transferred here.

5           MR. ZABARAUSKAS:  That's correct, Your Honor.

6           THE COURT:  There was motion practice there but the

7   judge in Nevada did not rule on the motion to dismiss; is that

8   correct?

9           MR. ZABARAUSKAS:  Correct.  She denied the motions

10   to dismiss without prejudice when she transferred venue.

11           MR. KAPLAN:  Judge Dorsey took the position that

12   since the case was being transferred to the Eastern District,

13   that she wasn't going to rule on the motion, so she thought it

14   more appropriate to have this Court --

15           THE COURT:  But that's different from dismissing

16   with prejudice.

17           MR. KAPLAN:  Well, she dismissed with --

18           THE COURT:  I mean without prejudice.

19           MR. ZABARAUSKAS:  She denied the motion without

20   prejudice.

21           THE COURT:  Dismissed because of the -- denied the

22   motion.  She denied the motion to dismiss?

23           MR. ZABARAUSKAS:  Without prejudice.

24           THE COURT:  Okay.

25           MR. ZABARAUSKAS:  She denied both motions to dismiss

1    without prejudice because she was transferring venue.

2              MR. KAPLAN:  What happened, Judge, is we were in

3    Nevada to argue the various motions.  At the hearing the

4    Scorsetti defendants had moved to transfer venue, so Judge

5    Dorsey made inquiry as to whether or not the Sungame

6    parties -- she didn't want to transfer only part of the case,

7    so she made inquiry as to whether or not there would be

8    jurisdiction over the Sungame parties in the Eastern District

9    of New York.  I advised her that we did believe there was

10   jurisdiction and that we had no objection if she wanted to

11   transfer the entire case to -- transferal of the entire case.

12   We had not moved to transfer the case.

13             THE COURT:  I see.

14             MR. KAPLAN:  It got transferred, and then the

15   motions -- she said she wasn't going to decide the pending

16   motions because she wasn't going to have the case.

17             THE COURT:  Well, I'm still a little bit confused.

18   When you say she wasn't going to decide the pending motions,

19   counsel phrases it as she dismissed them without prejudice.

20             MR. KAPLAN:  Right.

21             THE COURT:  Which she did?

22             MR. KAPLAN:  She denied the motions without

23   prejudice to our refiling them here.

24             THE COURT:  Okay.  You are now seeking permission to

25   refile them here?

1          MR. KAPLAN:  That's correct, Judge.

2          THE COURT:  And just, if you would, briefly go

3    through the grounds for the motion and then you want other

4    grounds that were not articulated in the papers before,

5    correct?

6          MR. KAPLAN:  No, actually not, Judge.  This is just

7    from -- I'm Steven Kaplan for the Sungame parties.  Our motion

8    that we intend -- would like to make in front of Your Honor is

9    the same motion.  The only difference is that there may be

10   certain choice of law issues that would have to be addressed

11   in the motion papers, but essentially I'm going to file --

12         THE COURT:  You are adding, it's not same the

13   motion, you are going to raise different issues I should say.

14         MR. KAPLAN:  Just different legal --

15         THE COURT:  Choice of law being, what is your

16   position about that.

17         MR. KAPLAN:  Well, under the -- it would appear

18   under what little we've looked at so far that Nevada's choice

19   of law standards would apply, but then when you do that Nevada

20   applies a principal contact question as to whether or not

21   to -- whether its laws would apply or New York law would

22   apply.

23         THE COURT:  Is there going to be a difference?

24         MR. KAPLAN:  Only on a couple of the causes of

25   action.  On the fraud claims, the answer is no.  Nevada state

1   law does recognize a conspiracy claim as an independent tort,

2   New York doesn't, but we don't think that's going to matter

3   because we don't think the underlying fraud claims are

4   sustainable.

5          There is a slight difference, realistically, on the

6   tortious interference with contract claim.  Again, we think

7   the results will be the same but New York recognizes an

8   economic justification defense, there's not the same defense

9   available under Nevada law.  That's really the only

10  substantive cause of action where I think there may be any

11  real difference in the law.  So it's really just that one

12  cause of action.

13         THE COURT:  The tortious interference cause of

14  action?

15         MR. KAPLAN:  The tortious interference cause of

16  action.  We think even under Nevada or New York law it's

17  dismissible, but if New York law were to apply we would have

18  to brief a little bit the issue slightly differently.

19         THE COURT:  What will be your position as to what

20  law applies?

21         MR. KAPLAN:  Well, we would take the position with

22  respect to the tortious interference claim that New York law

23  should apply.  The tablets that are the subject of this

24  lawsuit were sold primarily in New York and in this district

25  and in Rockland County, and the surrounding counties.

1    THE COURT:  How many were sold that are the subject

2    of the lawsuit?  You just -- maybe plaintiff should --

3    MR. KAPLAN:  Their claim is approximately

4    1.2 million in charge backs.

5    THE COURT:  But how many tablets would that be?

6    MR. KAPLAN:  Well, if the tablets sell for about

7    thousand dollars a unit, there would be about 1200 units and

8    then there is -- there is a security agreement at issue here

9    too, Your Honor.

10   We have tried to secure some of these tablets.  Some

11   of the potential obligations of Scorsetti that they may have

12   we've secured that through pledging certain collateral.

13   THE COURT:  I understand plaintiff wants to make a

14   motion as well.

15   MR. ZABARAUSKAS:  Yes, Your Honor, plaintiff wants

16   to make a motion with respect to the Scorsetti defendants for

17   either entry or default judgment or alternatively for leave to

18   file a motion for partial summary judgment.  With respect to

19   the summary judgment, the contract that we have with the

20   Scorsetti defendants said they would be responsible for all

21   charge backs.  Ms. Scorsetti signed a personal guarantee of

22   the obligations of the Scorsetti defendants under that

23   agreement.  The charge backs were all sent to them, were in

24   the bank statements that were provided to them, they've never

25   objected to them.  It's a case of they are strictly liable

1    with respect to the charge backs and have not objected to them

2    and have not reimbursed us with respect to the charge backs.

3              With respect to the request for default judgment,

4    Your Honor, that was because their response was due back on

5    August 30th.

6              THE COURT:  Response to what?

7              MR. ZABARAUSKAS:  To the complaint to refile a

8    motion to dismiss if they wanted to.  They waited two months.

9    We, on numerous occasions, inquired of them, your time is

10   expired, what are you going to --

11             THE COURT:  To answer?

12             MR. ZABARAUSKAS:  Yes, to answer or respond.

13             Your Honor, we think the summary judgment it's clear

14   in this case they just owe us for the charge backs, period.

15   So we would ask for authority to file that motion.

16             We also asked for authority to file a pre-motion

17   attachment with respect to a condominium that Ms. Scorsetti

18   has in Las Vegas.  We've spoken with counsel, I believe we

19   have a stipulation that we will be putting together which will

20   resolve the need for that motion to go forward pursuant to

21   which they will -- they've taken that condominium off the

22   market and they will provide us with at least two week's

23   notice before either selling or putting it back on the market,

24   and if they do and there is a need for pre-judgment attachment

25   that would give us sufficient time to come back to Your Honor

1   and file the motion then.

2          THE COURT:  So I take it there was some discovery

3   done in Nevada, there was something done -- I mean, some

4   discovery.

5          MR. ZABARAUSKAS:  No discovery was taken in Nevada.

6   There was a discovery deadline cut-off date of December 16th.

7   Counsel for Scorsetti defendants points out that if the

8   transfer of venue was granted, that discovery cut off would

9   not apply to them.  Our position is it still does apply with

10  respect to the Sungame defendants, but nobody has taken any

11  discovery in this case.

12         Quite frankly, with respect to our request for

13  summary judgment, the documents we're relying upon are the

14  agreement -- the agreements that they signed and the

15  statements which show the charge backs and we don't believe

16  there's any need for any discovery with respect to them.

17         This case has been going on since January of this

18  year.  It's been delayed with motions to dismiss and the

19  transfer of venue issues and we just want to move as fast as

20  we can at this stage.  We believe that the summary judgment

21  with respect to the breach of contract is clear and based upon

22  the documents it's very similar to an action on a note.

23         THE COURT:  And that would be summary judgment in

24  what amount?  You're talking about summary judgment --

25         MR. ZABARAUSKAS:  Approximately 1.2.

1          THE COURT:  1.2 million?

2          MR. ZABARAUSKAS:  Yes.

3          THE COURT:  I take it this -- prior to commencing

4    suit was there discussion among the parties or the principals

5    about resolving this case?

6          MR. ZABARAUSKAS:  Prior to the commencement of this

7    suit there were discussions.  There was the security interest

8    which was provided in certain of the tablets.  We received no

9    payments.

10         THE COURT:  Is there some reason that you can't

11   engage in serious discussions to resolve this case now?  Let

12   me ask the parties, what about it, Mr. Kaplan?

13         MR. KAPLAN:  Your Honor, I do not -- I think there

14   is reasonable grounds that we could discuss a potential

15   settlement.  I did speak to Mr. Zabarauskas and the in-house

16   counsel before we met with Magistrate Levy.

17         THE COURT:  So you have met with Judge Levy and

18   there's been --

19         MR. KAPLAN:  We met with Judge Levy about 45 minutes

20   ago, an hour ago --

21         THE COURT:  Okay.

22         MR. KAPLAN:  -- and he did advise us that if we

23   wanted either his help or mediation, that it was available.

24         What I had proposed to counsel before we met with

25   the Magistrate Judge was a plan by which we would be able to

1    sell off the inventory.  They're holding 1600 tablets.  I made

2    a proposal, an oral proposal as to how we could proceed to

3    sell the tablets -- actually buy the tablets from them, which

4    we would sell and as we're selling them to continue to buy

5    more tablets from them to liquidate this inventory, which

6    would pay off most, if any, charge backs.

7           There was some interest and I advised

8    Mr. Zabarauskas that I would make a written proposal within

9    the next week just laying out how we would foresee doing this

10   to see if it was something of interest.

11          THE COURT:  What about it, Mr. Zabarauskas?

12          MR. ZABARAUSKAS:  Your Honor, they made a lot of

13   promises to us in the past that they haven't fulfilled.  One

14   of the other problems we have here is the fraud that was

15   committed.  When they say they've been selling tablets, that's

16   not entirely truthful.  What they did was they purported to

17   sell tablets, ran credit card charges -- the Sungame

18   defendants -- we only have a credit card processing agreement

19   with the Scorsetti defendants, not the Sungame defendants.

20          Sungame was a company that was in dire financial

21   situation, I assume it probably still is.  They lost I think

22   $9 million in 2014.  They needed money desperately so what

23   they did is got together with the Scorsetti defendants and

24   said, hey, can we run some credit card charges through your

25   account.  The Scorsetti defendants permitted that and then

1   instead of the sales, what the Sungame defendants would do is

2   basically were taking investment money from investors.  They

3   would say, quote/unquote, buy tablets for a thousand dollars a

4   piece from us, we're going to give you a rebate check back for

5   the full amount of your money, plus give you this educational

6   credit or possibly ship you some of the tablets.  It was a

7   financing scheme to raise capital for their business.  In

8   fact, in their 2014 SEC filings they referred to these people

9   as investors.

10          So you don't have situations where --

11          THE COURT:  You mean the parties who were

12   purportedly purchasing the tablets?

13          MR. ZABARAUSKAS:  Correct.  Your Honor, they have

14   people buying -- individuals buying 25 to a hundred of these

15   tablets expecting they were going to get their money back.

16          Now Mr. Chandran has a long history of securities

17   fraud --

18          THE COURT:  That's the principal of Sungame?

19          MR. ZABARAUSKAS:  And attached to the complaint is

20   just one instance where there was a finding up in Alberta.

21   What he was doing was promising people he was going to pay

22   them 50 or 75 percent return on their money within a matter of

23   weeks or matter of a months.

24          THE COURT:  That should have raised some suspicion.

25          MR. ZABARAUSKAS:  That's the same game they played

1    here.  So instead, what they did they ran the credit card

2    charges, they laundered them through the Scorsetti defendants'

3    account who we had an agreement with.

4            So when they say these are worth a thousand dollars,

5    when they say they're going to sell these things, you know, it

6    raises real concerns.

7            THE COURT:  How much are you out?  You are out

8    $1.2 million?

9            MR. ZABARAUSKAS:  Yes, Your Honor.

10           THE COURT:  So that's how we settle cases.  Somebody

11   gives you money.  So is this a proposal that you are

12   interested in in pursuing in terms of getting money back?

13           MR. ZABARAUSKAS:  We will take the proposal, we'll

14   take it to management to take a look at.  And right now you've

15   got three lawyers here, you don't have any of the business

16   people.  We need a businessperson to take a look at that

17   proposal.

18           THE COURT:  But it's not something, as a lawyer, you

19   would reject out of hand taking a look at or... tell me again,

20   Mr. Kaplan, the nature of the proposal that you are talking

21   about that you mentioned to Judge Levy, what would you do?

22           MR. KAPLAN:  Your Honor, the plaintiff is holding

23   approximately 1600 of the tablets, which we've been told

24   they're in a warehouse in Arizona.  Assuming -- and I've been

25   told they're maintained in exactly the same condition they

1   were delivered, assuming that's true, what we were proposing

2   is that we essentially buy back the inventory over time.

3   Rather than -- we would pay -- we would agree on a price per

4   unit, we would buy a certain number of units up front, so we

5   would front a certain amount of money, get those units,

6   they're going to have to be retrofitted because they're two

7   years old.  They probably need new batteries because they may

8   have -- so there is a certain amount of work that's going to

9   be needed.  They would then sell those units and help use the

10  proceeds from the sale of those units to purchase the next

11  group.

12          So, essentially, we would liquidate the inventory to

13  allow for the recovery of most of the charge backs.

14          Mr. Zabarauskas has said they don't really trust

15  Mr. Chandran and so the thinking is that they don't have to

16  trust us, because they're only going to release items from

17  inventory upon delivery of funds.  So they're basically paying

18  them --

19          THE COURT:  You are paying them up front for the

20  inventory?

21          MR. KAPLAN:  We're paying up front, they're going to

22  deliver the units.  I've been told by my client that they

23  would guarantee that they could buy at least a hundred units a

24  month to liquidate.  And we're talking approximately $600 a

25  unit is what we would be able to pay to allow for the funds

```
1    to -- to be able to retrofit them and sell them.

2              MR. ZABARAUSKAS:  Your Honor, first of all, he's

3    talking about two years dealing with people who have been

4    dishonest with respect to the sale of these products.  And by

5    the way, we haven't even spoken about anything coming from the

6    Scorsetti defendants, who are absolutely on the hook for all

7    the charge backs personally and we believe they at least have

8    some assets where they'll be able to pay that off now as

9    opposed to having to wait two years.

10             THE COURT:  How did the Scorsetti defendants fit

11   into the settlement?  How would you -- what would your --

12             MR. CANNA:  Well, Your Honor, I haven't spoken to my

13   client about this.  These funds that they're talking, this

14   million dollars -- and I think this is alleged in the

15   complaint -- went straight to Sungame.  So this wasn't, you

16   know, where my client took a percentage of these funds, I

17   think they have -- there was a Loft bank account and they --

18   you could see where the money went.

19             I would also like to just point out, Your Honor, and

20   plaintiff's counsel keeps referring to them as the Scorsetti

21   defendants, but there are three individual defendants here:

22   The Loft, which had a separate agreement with NewTek, an

23   account with NewTek; Scorsetti Design, which is another

24   company which had a separate agreement and account with

25   NewTek; and then Ms. Scorsetti, the individual who is alleged
```

1   had a guarantee.  And I think that guarantee is questionable.

2   There are defenses to that guarantee.  I think it was

3   contained in the application not in the contract.  I think

4   it's not clear whether she was signing on her personal behalf

5   or on behalf of The Loft.  And I also --

6          THE COURT:  Are you disputing that there was an

7   agreement as described by counsel between his client and your

8   client?

9          MR. CANNA:  There was no agreement between

10  Ms. Scorsetti and NewTek -- I mean there's an alleged --

11         THE COURT:  Guarantee.

12         MR. CANNA:  Right.

13         THE COURT:  But who was the agreement with?

14         MR. CANNA:  There were two separate agreements:

15  There was one agreement signed with The Loft and there was one

16  agreement signed with Scorsetti Design.  And my understanding

17  is they each had their own separate accounts.  So I'm not sure

18  even what the allegation is as to why these accounts -- or why

19  these two companies are both liable for these charges which I

20  believe were completely contained within The Loft account.  So

21  I think there is an issue related to that.

22         There were agreements, but there was no separate

23  agreement.

24         THE COURT:  Are you saying that the individuals that

25  you represent are not the guarantor, The Loft and the other

1  design company didn't profit out of this at all?  That doesn't

2  make sense.

3       MR. CANNA:  So they were a design company and there

4  was a relationship with Sungame and my client, but they

5  were -- it was related to other ventures.  They were doing

6  design and they used their showroom I believe as a showroom

7  for these tablets.  And I believe the understanding was that

8  down the road possibly my client would be engaged for

9  additional design work, so --

10      THE COURT:  What about the other client, The Loft?

11      MR. CANNA:  I'm talking about all -- these clients

12  are the same way.  The Loft was an entity, my understanding

13  is, that sold furniture and the Scorsetti Design was a design

14  company, an interior design company.  So that design company,

15  if there were sales for furniture or whatever, it would be

16  sold through this Loft entity.  And --

17      THE COURT:  So it was the accounts of these two

18  companies that were being used to purchase the --

19      MR. CANNA:  Only one account, my understanding is,

20  was being used, only The Loft's account was being used.

21      THE COURT:  Was being used to purchase these

22  tablets.

23      MR. CANNA:  Tablets, correct.

24      MR. KAPLAN:  Your Honor, I would say we're certainly

25  prepared to address the concerns -- if there is a basic

```
1    interest in allowing a sell off of this inventory to generate

2    funds, we're certainly prepared to discuss how quickly it

3    could be done, putting some certain time limits and giving

4    them whatever assurances.  You know, we haven't had those

5    discussions yet.  I had suggested mediation, so far plaintiffs

6    have not expressed a lot of interest in doing that, but I

7    really do think if we got everybody together some of these

8    issues could be resolved, assuming that there is an interest

9    in allowing us to sell off the inventory.  Because, honestly,

10   that's the way most of the money to fund any settlement is

11   going to be generated.  There is this big asset that's just

12   sitting in the warehouse.

13              THE COURT:  Why do you think there's a market for

14   the inventory?

15              MR. KAPLAN:  I've been told, Mr. Chandran has told

16   me he has a market, that they are marketing a couple of other

17   products right now which they are going to launch soon all

18   connected to this gaming industry and 3D industry.  And he

19   thinks that he's going to be able to package these together

20   efficiently.  I don't know that he can, but he tells me that

21   he's comfortable he can do it.

22              THE COURT:  How soon will all of this happen that

23   would generate money?  I mean, how soon is he prepared to

24   begin this buyback?

25              MR. KAPLAN:  Well assuming we could probably start
```

1  something in 30 days, 45 days.  There's going to be a slight

2  delay just because these units have to be upgraded.  There has

3  to be software -- I apologize, Judge, I don't fully understand

4  the technicality.  These units have been sitting in boxes for

5  two years, so they have to be upgraded somewhat --

6          THE COURT:  You mean he has to figure out a plan for

7  upgrading them?

8          MR. KAPLAN:  No, he knows how to do it.

9          THE COURT:  Well, then why does that affect the

10 buyback?

11         MR. KAPLAN:  It doesn't, it just delays slightly how

12 quickly he sells them.  He already has somebody available who

13 will come in --

14         THE COURT:  You mean so the plan is we buy back a

15 bunch of them, we sell them, we give you the --

16         MR. KAPLAN:  We then buy back another bunch.

17         THE COURT:  All right.  So you pay them up front for

18 the first group.

19         MR. KAPLAN:  We pay them up front for the first

20 batch and then --

21         THE COURT:  Then you start selling them and paying

22 back the others.  You don't have a clear idea now of how long

23 this process would take.

24         MR. KAPLAN:  Well, Mr. Chandran said he would --

25 he's comfortable guaranteeing that he would buy at least a

1    hundred a month.  He thinks he could do this in under a year.

2              THE COURT:  What does the guarantee amount to?  If

3    he doesn't buy a hundred, he pays for a hundred, what's the

4    guarantee?

5              MR. KAPLAN:  I think it would have to be something

6    along those lines that he would guarantee -- if we're talking

7    about $600 a unit, he would guarantee something along the

8    lines of $60,000 a month.

9              THE COURT:  How long is it going to take him to get

10   this -- you and him to get these proposals together?

11             MR. KAPLAN:  Well, I could try to get something in a

12   week.  We have Thanksgiving coming up, otherwise I would say

13   by the end of this week, but say by next Tuesday I could have

14   something in writing to Mr. Zabarauskas.

15             THE COURT:  Is there something, Mr. Canna, your

16   clients would be willing to throw into the package?

17             MR. CANNA:  I haven't had that conversation with

18   them, Your Honor.

19             THE COURT:  It might be a good time to do it.  I'm

20   just thinking, we're talking about now going into a whole new

21   round of litigation which is going to be very expensive for

22   everyone.  It seems if there is a way to resolve this you

23   ought to do that now.

24             MR. ZABARAUSKAS:  Judge, to just put this in

25   historical perspective, these charges and charge backs were

1    through about September 2014.  Between then and when we filed

2    the suit in January 2016, we had these discussions with the

3    Sungame folks and we heard their promises as to how they were

4    going to sell things and how they were going to pay us money.

5              THE COURT:  Did you reach an agreement with them at

6    that point in time to do it?

7              MR. ZABARAUSKAS:  No, they made promises they were

8    going to make payments to us, they paid us zero.  So they're

9    talking about --

10             THE COURT:  I mean, is the bottom line you are not

11   interested in hearing this kind of proposal again in terms of

12   settlement, because we will save everybody time of even

13   looking into it if that's what you are saying.

14             MR. ZABARAUSKAS:  We're willing to listen but we

15   just don't think it should stop the case from going forward.

16   This case has been going forward for over a year.  Like I

17   said, it's been another year before that when we tried to get

18   somewhere and to be quite honest with Your Honor, it's kind of

19   relying on Mr. Chandran's ability to sell things and his

20   promises for everything, to us it's not something that's worth

21   holding up the case any further for.

22             If they want to make this proposal, we can reach an

23   agreement on it and we can get back to them quickly, you know,

24   that's fine, but at this stage we're not willing to just delay

25   the case any further.

22

1        THE COURT:  All right.  Well, then, let's go forward

2    with the motion schedule.

3        MR. ZABARAUSKAS:  Your Honor, counsel had a meeting

4    on Friday and we discussed briefing schedules that motions

5    would be filed by December 5th, oppositions by December 30th,

6    replies by January 9th.

7        MR. CANNA:  Your Honor, I would just like to address

8    the summary judgment motion that plaintiff's counsel is

9    proposing.  I had written in my letter regarding discovery,

10   I've just substituted in as counsel, I was not involved in the

11   Nevada case for the Scorsetti defendants.  My understanding is

12   that the only discovery that was conducted was Rule 26

13   disclosures were exchanged and I believe it was contemplated

14   that that discovery was delayed pending this change of venue.

15   And within their discovery -- I guess this is the stipulated

16   discovery plan -- there is a provision in here that the

17   Scorsetti defendants have moved to transfer venue of the

18   claims asserted against them to the Eastern District of New

19   York.  In the event the Court grants the venue motion, the

20   dates set forth in this discovery plan shall no longer be

21   binding upon the Scorsetti defendants.

22       So, Your Honor, when plaintiff's counsel says, oh,

23   they've had the opportunity to conduct discovery and the

24   deadline is December 17th, it's not exactly accurate and it

25   seems like counsel --

```
1              THE COURT:  Well, what's your point?  I'm setting a

2    motion schedule now.  Do you --

3              MR. CANNA:  We need discovery to oppose.

4              THE COURT:  Need discovery of what?

5              MR. CANNA:  There's issues related like --

6              THE COURT:  He's basing it just on a document.  I

7    understand you have a document, you say this document is what

8    entitles -- this contract is what entitles us some money,

9    right?

10             MR. ZABARAUSKAS:  The contract, the quote/unquote

11   personal guarantee.

12             THE COURT:  The what?

13             MR. ZABARAUSKAS:  The personal guarantee and the

14   statements which show all of the charge backs that they never

15   objected to.

16             MR. CANNA:  Well, I think there are many issues

17   there, Your Honor.  There's issues regarding --

18             THE COURT:  I tell you what, he can make his motion,

19   you can respond.  If part of your response is I need discovery

20   of X, Y, and Z, that can be in your motion.  You can put that

21   as part of your response.

22             All right.  So we need an oral argument date after

23   January 9th.  Why don't I put oral argument down for

24   January 19th at 2:00 o'clock.

25             Now if you are going to go forward with your
```

1   settlement proposal, counsel, Mr. Kaplan, you will get

2   something to them Tuesday -- a week from Tuesday did you say?

3              MR. KAPLAN:  No, I'll try to do it, yes, a week from

4   tomorrow.

5              THE COURT:  Mr. Canna, you will discuss with your

6   clients what they can do in terms of perhaps making the whole

7   discovery a bit more -- something that plaintiff might be more

8   interested in.

9              MR. CANNA:  I will have that conversation with them,

10  Your Honor.

11             THE COURT:  Now I have already set the other

12  schedule down, but should we have a settlement conference

13  after all these things are exchanged?

14             MR. ZABARAUSKAS:  Your Honor --

15             THE COURT:  How long is it going to take you,

16  Counsel, to review the document and see whether you have any

17  interest?

18             MR. ZABARAUSKAS:  We can do it within a week.

19             THE COURT:  Okay.

20             MR. ZABARAUSKAS:  Also, Your Honor, with respect to

21  our prior request to file a motion for a prejudgment

22  attachment, I suggest that we just submit a stipulation as to

23  what counsel for the Scorsetti defendants and I agreed to this

24  morning.

25             THE COURT:  That's fine.  So you would respond to

1    their proposal by December 6th.

2              MR. ZABARAUSKAS:  Yes, Your Honor.

3              THE COURT:  Why don't we have just a settlement

4    conference here on December 9th at 9:30.

5              MR. ZABARAUSKAS:  Judge, can I just check my

6    calendar.  I'm coming in from California, I'll be in, I think,

7    New York the following week.

8              THE COURT:  Okay.  You have local counsel here?

9              MR. ZABARAUSKAS:  I'm admitted in New York and our

10   firm is in New York as well.

11             THE COURT:  I can put it to the following week if

12   you'll be here anyway.

13             MR. ZABARAUSKAS:  I think that will be -- could we

14   put it on December 15th or 16th -- December 14th, Your Honor?

15             THE COURT:  Yes, I can put it down at noon.

16             MR. ZABARAUSKAS:  Yes, Your Honor.

17             THE COURT:  Does that work for the other side?

18             MR. KAPLAN:  That does, Judge.

19             Are you going to want us to bring the parties to

20   that or I mean I could --

21             THE COURT:  I would suggest that both sides be able

22   to get in contact with your clients.  I don't know that you

23   need to bring them here.

24             MR. KAPLAN:  Okay.

25             THE COURT:  But I do want you to have the capacity

1    to get in contact with them if we are close to settling it.

2              Okay, thank you, gentlemen.

3              MR. ZABARAUSKAS:  Thank you, Your Honor.

4              MR. KAPLAN:  Your Honor, just in light of the fact

5    we're going to meet on the 14th, we had discussed about

6    starting some discovery, but I would ask that we could at

7    least stay discovery through December 14th only because if

8    we're going to try to settle it why waste a lot of money and

9    time between now and the 14th.  We're not talking about a lot

10   of time.

11             MR. ZABARAUSKAS:  Your Honor, we would oppose

12   staying discovery.  We had had a discussion to a discovery

13   deadline for the whole case of March 31st.  If they want to

14   take discovery beforehand, if they want to serve us with stuff

15   or, you know, they're able to, but if we're going to set a

16   discovery deadline in the case of March 31st there's no need

17   for any type of stay.

18             THE COURT:  I won't stay it.

19             Did you discuss this with the magistrate, by the

20   way?

21             MR. ZABARAUSKAS:  Yes, Your Honor.

22             THE COURT:  You got a discovery schedule from the

23   magistrate, right?

24             MR. ZABARAUSKAS:  That, we discussed that.

25             MR. KAPLAN:  We had worked this out ahead of time

```
 1   with counsel.

 2              THE COURT:  All right.

 3              MR. CANNA:  We had discussed going back to him

 4   discussing it with him after we saw what happened here, so we

 5   were going to go back --

 6              THE COURT:  Well you know what happened here.

 7              MR. KAPLAN:  We're going to go try and track down

 8   the magistrate now.

 9              THE COURT:  Okay, fine.

10              MR. ZABARAUSKAS:  Thank you, Your Honor.

11              MR. KAPLAN:  Thank you, Your Honor.

12              MR. CANNA:  Thank you.

13              (Matter concluded.)

14                     *     *     *     *     *

15   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
16

17   s/ Georgette K. Betts                November 29, 2016

18   GEORGETTE K. BETTS                   DATE

19

20

21

22

23

24

25
```